UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,

Plaintiff,

v.

INTAKE ON DEMAND LLC,
d/b/a and/or a/k/a CONSUMER
ENROLLMENTS CENTER;

SPRING INVESTMENTS, INC.,
d/b/a MEDIA MERCHANTS GROUP
and/or INJURY CLAIMS SERVICE;

ROCHELLE MARISSA ADLER,
a/k/a ROCHELLE MARISSA FISHMAN;

**COMPLAINT**

ANTHONY J. RUSSO, JR., P.A.,
d/b/a THE RUSSO FIRM;

ANTHONY JOHN RUSSO, JR.,
d/b/a RP LAW LLC;

MATTHEW A. DOLMAN, PLLC,
f/k/a MATTHEW A. DOLMAN, P.A.,
d/b/a DOLMAN LAW GROUP;

TORHOERMAN LAW LLC;

SADDLE ROCK LEGAL GROUP LLC; and

DOE DEFENDANTS I-X,

Defendants.

---

# COMPLAINT

NOW COMES Plaintiff MARK W. DOBRONSKI ("Plaintiff"), appearing *in propria persona*, and for his Complaint against Defendants alleges:

## INTRODUCTION

1. This action arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.111, *et seq.*, and the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059, from a series of eighteen unsolicited telephone solicitation calls made to Plaintiff's residential telephone number between August 16 and August 29, 2023 (collectively, the "Subject Calls"), for the purpose of soliciting Plaintiff as a prospective Camp Lejeune claimant.

2. The calls were generated through a multi-level legal lead-generation system in which telemarketers and lead generators called and qualified consumers before routing successful leads to lawyers and law firms seeking Camp Lejeune clients. Plaintiff's use of unique controlled investigative information enabled him to trace his particular lead through Consumer Enrollments Center and ultimately to representation agreements identifying the Russo/Dolman law firms and, subsequently, TorHoerman and Saddle Rock.

3. Plaintiff alleges that each Defendant participated in, furthered,

authorized, ratified, and/or knowingly accepted the benefits of a common commercial scheme to generate, qualify, route, and convert Camp Lejeune telephone leads into law-firm clients. Under the direct, vicarious, agency, ratification, concert-of-action, civil-conspiracy, common-design, and other derivative-liability principles alleged herein, Plaintiff alleges that all Defendants are jointly and severally liable for the actionable violations committed in furtherance of that common scheme.

## PARTIES

4. Plaintiff MARK W. DOBRONSKI is an individual, citizen of the United States, resident of Orange County, Florida, and maintains a residence in Washtenaw County, Michigan.

5. Defendant INTAKE ON DEMAND LLC ("IOD") is a California limited liability company which maintained its principal office at 1033 B Avenue, Suite 200, Coronado, California 92118.

6. Consumer Enrollments Center ("CEC") appears to have been a business or operational name rather than an independently registered juridical entity.

7. Defendant SPRING INVESTMENTS, INC. ("Spring") is a South Dakota corporation which conducted business under the fictitious business name MEDIA MERCHANTS GROUP ("MMG") and, upon information and belief, also used the name INJURY CLAIMS SERVICE ("ICS"). Spring maintains a mailing address at

120 22nd Avenue South, Suite 138, Brookings, South Dakota 57006-2600.

8. Defendant ROCHELLE MARISSA ADLER, a/k/a Rochelle Marissa Fishman ("Adler"), is an individual residing at 7301 Rutherford Hill Drive, West Hills, California 91307-5204.

9. Defendant ANTHONY J. RUSSO, JR., P.A. ("Russo Firm") is a Florida professional corporation doing business under the fictitious business name THE RUSSO FIRM, with its principal office located at 1001 Yamato Road, Suite 106, Boca Raton, Florida 33431-4403.

10. Defendant ANTHONY JOHN RUSSO, JR. ("Russo") is an individual residing at 411 N. New River Drive E., Apartment 3902, Fort Lauderdale, Florida 33301-3184, who, during the relevant period, conducted business using the name RP LAW LLC ("RP Law").

11. Defendant MATTHEW A. DOLMAN, PLLC ("Dolman"), formerly known as MATTHEW A. DOLMAN, P.A., is a Florida professional limited liability company doing business as DOLMAN LAW GROUP, with its principal office located at 800 North Belcher Road, Clearwater, Florida 33765-2103.

12. On July 24, 2026, Matthew A. Dolman, P.A., a Florida professional corporation, converted pursuant to Fla. Stat. § 605.1045 into Matthew A. Dolman, PLLC. Under Fla. Stat. § 605.1046(1), the converted entity is the same entity, without

interruption, as the converting entity, and all debts, obligations, and other liabilities of Matthew A. Dolman, P.A. continue as debts, obligations, and liabilities of Matthew A. Dolman, PLLC. Accordingly, the claims alleged herein against Dolman concern the same continuous legal entity that existed as Matthew A. Dolman, P.A. at the time of the Subject Calls.

13. Defendant TORHOERMAN LAW LLC ("TorHoerman") is an Illinois limited liability company with its principal office located at 210 South Main Street, Edwardsville, Illinois 62025-1922.

14. Defendant SADDLE ROCK LEGAL GROUP LLC ("Saddle Rock") is an Arizona limited liability company with its principal office located at 655 15th Street Northwest, Suite 800, Washington, District of Columbia 20005-5705.

15. DOE DEFENDANTS I-X are presently unidentified individuals and/or business entities that participated in acquiring, generating, processing, selling, purchasing, transferring, routing, allocating, or delivering the Subject Calls or resulting Camp Lejeune leads.

16. Plaintiff will seek leave promptly to substitute the actual identities of Doe Defendants as they are learned.

**JURISDICTION**

17. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331

because this action arises under the TCPA, 47 U.S.C. § 227, et seq.

18. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related claims arising under the MHSSA and FTSA because those claims arise from the same calls, transactions, lead-generation activities, recordings, records, and representation agreements underlying Plaintiff's federal claims.

19. This Court has personal jurisdiction over the entity Defendants pursuant to M.C.L. § 600.715 because they transacted business within Michigan and/or caused acts to be done or consequences to occur within Michigan giving rise to this action.

20. This Court has personal jurisdiction over the individual Defendants pursuant to M.C.L. § 600.705 because they transacted business within Michigan and/or caused acts to be done or consequences to occur within Michigan giving rise to this action.

## VENUE

21. The Subject Calls were received by Plaintiff while he was physically located at his Washtenaw County residence.

22. The calls occupied Plaintiff's telephone line, caused charges to Plaintiff, invaded Plaintiff's residential privacy, and produced their consequences within this District.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the

complained of calls were received in this District.

## GENERAL ALLEGATIONS

### Plaintiff's Number and Receipt of the Calls

24. At all times relevant hereto, Plaintiff subscribed to and was the regular user of residential telephone number 321-***-0911 ("Plaintiff's Number").

25. Plaintiff's Number bears Florida area code 321.

26. Plaintiff's telephone service utilizes Voice Over Internet Protocol ("VoIP") technology and permits Plaintiff to answer incoming calls at the residence where he is then located.

27. Plaintiff received each of the Subject Calls while physically present at his Washtenaw County, Michigan residence.

28. The Subject Calls were not forwarded from another telephone number. Defendants or their agents directly dialed Plaintiff's Number.

29. Plaintiff is charged on a per-call and per-minute basis for incoming calls received at Plaintiff's Number.

### Prior Action

30. Plaintiff previously filed an action arising from the same Subject Calls captioned *Mark W. Dobronski v. Anthony J. Russo, Jr., P.A.*, *et al.*, Case No. 2:23-cv-12288-SKD-KGA.

31. On September 30, 2024, the Court dismissed Plaintiff's federal claims WITHOUT PREJUDICE under Fed. R. Civ. P. 8, concluding that the prior pleading did not adequately distinguish the particular defendants, calls, and theories of direct, vicarious, partnership, and concerted liability.

32. The Court expressly did not adjudicate Defendants' substantive Rule 12(b)(6) arguments concerning whether the complaint otherwise stated claims under the TCPA.

33. This refiled Complaint addresses that Rule 8 concern by separately identifying the roles of the lead-generation entities and downstream law-firm participants while alleging that they participated in a common scheme giving rise to derivative and joint liability.

**The Legal Lead-Generation Model**

34. Lawyers and law firms seeking Camp Lejeune claimants had a commercial need for qualified prospective clients.

35. Third-party legal-marketing companies, telemarketers, and lead generators supplied that demand by locating persons who might qualify to assert Camp Lejeune claims.

36. The economic commodity generated by that process was a qualified prospective-client lead.

37. Upon information and belief, outbound calls were initiated to large numbers of consumers without the originating caller necessarily determining in advance which particular law firm ultimately would receive each successfully qualified lead.

38. The calling operation first attempted to determine whether the called person satisfied specified Camp Lejeune criteria.

39. A consumer satisfying preliminary criteria could then be transferred to additional intake or verification personnel.

40. Only after qualification could a lead be allocated, sold, transferred, or routed to a downstream lawyer or law firm.

41. Accordingly, an unsuccessful call, hang-up, or dead-air call may be readily identifiable as a call initiated by the lead-generation operation even though the particular downstream purchaser that would have received the lead cannot yet be identified.

42. The particular downstream allocation of such unsuccessful calls is contained, if anywhere, in Defendants' campaign records, client codes, lead-routing records, CRM data, contracts, invoices, and other internal records.

43. Plaintiff's inability to possess those internal records before discovery does not make the originating caller unidentified where independent evidence

identifies the lead-generation operation responsible for making the call.

44. Discovery is necessary to determine the complete path between the source that first selected Plaintiff's Number and the ultimate downstream law-firm recipients.

45. Plaintiff presently does not know whether one or more Doe Defendants supplied calling lists, consumer data, telephone numbers, dialing infrastructure, or prospective-client information used by Spring/ICS, IOD/CEC, or both.

46. Plaintiff likewise does not presently know whether one or more Doe Defendants operated an upstream lead-generation source serving multiple legal-marketing campaigns or multiple downstream purchasers.

47. The identities and precise functions of the Doe Defendants are concealed from called consumers by the multi-level structure of the lead-generation process and cannot reasonably be determined without discovery.

**THE CALLS**

48. Before August 16, 2023, Plaintiff had received numerous Camp Lejeune telephone solicitations at Plaintiff's Number.

49. Plaintiff repeatedly communicated that he did not wish to receive such solicitations.

50. Nevertheless, the Camp Lejeune calls continued.

51. Between August 16 and August 29, 2023, Plaintiff received eighteen additional calls:

| Call | Date and Time | Caller Identification |
|---|---|---|
| 1 | August 16, 2023 10:48 A.M. | 321-221-5525 / WINTER GDN FL |
| 2 | August 16, 2023 11:40 A.M. | 619-586-6076 / CONSUMER ENROLL |
| 3 | August 16, 2023 11:41 A.M. | 866-552-6086 / CONSUMER ENROLL |
| 4 | August 16, 2023 11:42 A.M. | 866-552-6086 / CONSUMER ENROLL |
| 5 | August 16, 2023 2:43 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 6 | August 16, 2023 3:38 P.M. | 866-552-6086 / CONSUMER ENROLL |
| 7 | August 17, 2023 10:33 A.M. | 619-586-6076 / CONSUMER ENROLL |
| 8 | August 17, 2023 5:33 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 9 | August 18, 2023 5:51 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 10 | August 21, 2023 1:43 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 11 | August 22, 2023 11:49 A.M. | 619-586-6076 / CONSUMER ENROLL |
| 12 | August 23, 2023 10:13 A.M. | 619-586-6076 / CONSUMER ENROLL |
| 13 | August 23, 2023 1:25 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 14 | August 23, 2023 3:27 P.M. | 619-586-6076 / CONSUMER ENROLL |
| 15 | August 24, 2023 10:39 A.M. | 619-586-6076 / CONSUMER ENROLL |
| 16 | August 29, 2023 5:24 P.M. | 866-552-6086 / CONSUMER ENROLL |
| 17 | August 29, 2023 5:25 P.M. | 866-552-6086 / CONSUMER ENROLL |
| 18 | August 29, 2023 5:33 P.M. | 866-552-6086 / CONSUMER ENROLL |

## Call 1

52. Plaintiff received Call 1 on August 16, 2023, at approximately 10:48 A.M.

53. Call 1 displayed telephone number 321-221-5525 and caller-identification name "WINTER GDN FL."

54. Both Plaintiff's Number and the displayed number bear Florida area code 321.

55. Upon answering by saying "hello," Plaintiff heard a "boink" or similar connection sound.

56. Approximately two to three seconds later, a male telemarketer came onto the line.

57. The male identified himself as "Michael with Injury Claims Services."

58. Michael asked whether Plaintiff or anyone in Plaintiff's family had served at Camp Lejeune.

59. Michael sought personally identifying information.

60. Plaintiff recognized that the caller was withholding the identity of the ultimate person or business for whom he was soliciting.

61. Plaintiff therefore supplied controlled identifying information.

62. Plaintiff supplied the unique controlled name "Lester Clarke."

63. Plaintiff did not supply Plaintiff's Number to Michael.

64. The calling operation necessarily possessed Plaintiff's Number before Call 1 was initiated.

65. Plaintiff had not given any Defendant prior express consent or prior express written consent.

66. Michael expressly stated that Plaintiff's Number "shows on the do not call list."

67. Michael nevertheless continued the solicitation.

68. Michael asked whether Plaintiff had another telephone number.

69. Plaintiff declined.

70. Michael live-transferred the call to a female identifying herself as "Tony" with the "Camp Lejeune Compensation Center."

71. Tony continued the Camp Lejeune intake and qualification process.

72. Tony transmitted an email to Plaintiff's controlled Lester Clarke email address.

73. The email was transmitted from Consumer Enrollments Center.

74. It attached a contingency-fee representation agreement on Russo Firm letterhead.

75. The agreement identified Russo Firm, RP Law, and Matthew A. Dolman, P.A., now Matthew A. Dolman, PLLC, as the law firms providing representation.

76. The agreement was populated with the controlled Lester Clarke information supplied during Call 1.

77. Tony attempted to induce Plaintiff to execute the agreement electronically.

78. When Plaintiff asked what company Tony actually worked for and where it was located, Tony terminated the call.

79. Plaintiff immediately called 321-221-5525 and received a reorder signal.

**Calls 2 and 5**

80. At approximately 11:40 A.M. on August 16, 2023, Plaintiff received Call 2 from 619-586-6076 / CONSUMER ENROLL.

81. The caller was Tony, who identified herself as being from "the Enrollment Center."

82. Tony asked for Lester.

83. Tony expressly referred to the representation agreement transmitted during the Call 1 transaction and, during Call 2, transmitted an email from Consumer Enrollments Center to Plaintiff's controlled email address.

84. Later that day, at approximately 2:43 P.M., Plaintiff received Call 5 from the same number.

85. The caller again was Tony.

86. Tony again asked for Lester concerning the Camp Lejeune claim.

87. Calls 2 and 5 were direct follow-up communications concerning the lead and representation agreement generated through Call 1.

**Calls 3, 4, and 6**

88. At approximately 11:41 A.M. on August 16, 2023, Plaintiff received Call 3 from 866-552-6086 / CONSUMER ENROLL.

89. Plaintiff picked up the telephone and said "hello"; no live caller spoke before the call terminated.

90. At approximately 11:42 A.M., Plaintiff received Call 4 from the same number.

91. Plaintiff picked up the telephone, said "hello," heard no live caller, and the call terminated after approximately eight seconds from initiation.

92. At approximately 3:38 P.M., Plaintiff received Call 6 from the same number.

93. Plaintiff picked up the telephone and said "hello"; no live caller spoke before the call terminated.

**Call 7**

94. On August 17, 2023, at approximately 10:33 A.M., Plaintiff received Call 7 from 619-586-6076 / CONSUMER ENROLL.

95. Plaintiff picked up the telephone and said "hello."

96. Plaintiff heard approximately three seconds of silence before a male began speaking and identified himself as "James with the Enrollment Center."

97. James asked for Lester.

98. James expressly stated that Plaintiff had done an intake the previous day with Tony "with the law firm Russo Dolman."

99. James refused to provide his surname or meaningful identifying information concerning CEC.

100. James described the Enrollment Center as being "like a concierge or receptionist for the attorneys."

101. Call 7 provides direct evidence linking the CEC operation to Russo Firm and Dolman.

**Calls 8 Through 11**

102. On August 17, 2023, at approximately 5:33 P.M., Plaintiff received Call 8 from 619-586-6076 / CONSUMER ENROLL.

103. Plaintiff picked up the telephone, said "hello," heard no live caller, and the call terminated after approximately eleven seconds from initiation.

104. On August 18, 2023, at approximately 5:51 P.M., Plaintiff received Call 9 from the same number.

105. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

106. On August 21, 2023, at approximately 1:43 P.M., Plaintiff received Call 10 from the same number.

107. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

108. On August 22, 2023, at approximately 11:49 A.M., Plaintiff received Call 11 from the same number.

109. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

110. Calls 8 through 11 originated from the same CEC lead-generation operation.

111. Plaintiff alleges those calls were made in furtherance of the common scheme alleged herein.

**Call 12**

112. On August 23, 2023, at approximately 10:13 A.M., Plaintiff received Call 12 from 619-586-6076 / CONSUMER ENROLL.

113. The caller again was Tony.

114. Tony again asked for Lester.

115. Tony again conducted Camp Lejeune qualification and intake activity.

116. Tony transmitted another email from Consumer Enrollments Center to Plaintiff's controlled Lester Clarke email address.

117. The attached representation agreement identified TorHoerman and Saddle Rock.

118. The agreement again contained the controlled Lester Clarke information

obtained through the telephone solicitation process.

119. Accompanying materials included correspondence on behalf of Saddle Rock and TorHoerman.

120. Tony attempted to induce Plaintiff to execute the representation agreement.

121. The same CEC operation therefore processed the same controlled prospective-client identity first into a Russo/RP Law/Dolman agreement and later into a TorHoerman/Saddle Rock agreement.

122. That crossover demonstrates that CEC was generating, processing, and allocating Camp Lejeune leads among downstream law-firm participants.

**<u>Calls 13 Through 18</u>**

123. On August 23, 2023, at approximately 1:25 P.M., Plaintiff received Call 13 from 619-586-6076 / CONSUMER ENROLL.

124. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

125. At approximately 3:27 P.M., Plaintiff received Call 14 from the same number.

126. Plaintiff picked up the telephone, said "hello," heard no live caller, and the call terminated after approximately six seconds from initiation.

127. On August 24, 2023, at approximately 10:39 A.M., Plaintiff received Call 15 from the same number.

128. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

129. On August 29, 2023, at approximately 5:24 P.M., Plaintiff received Call 16 from 866-552-6086 / CONSUMER ENROLL.

130. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

131. At approximately 5:25 P.M., Plaintiff received Call 17 from the same number.

132. Plaintiff picked up the telephone and said "hello"; no live caller spoke before termination.

133. At approximately 5:33 P.M., Plaintiff received Call 18 from the same number.

134. Plaintiff picked up the telephone, said "hello," heard no live caller, and the call terminated after approximately eleven seconds from initiation.

## SPECIFIC ALLEGATIONS

### No Prior Consent; No Duty to Opt Out; Controlled Investigative Information

135. Plaintiff did not provide Plaintiff's Number to any Defendant, caller,

telemarketer, lead generator, law firm, website, intermediary, or other person in connection with Camp Lejeune representation or the Subject Calls.

136. Plaintiff did not authorize any other person or intermediary to provide Plaintiff's Number to Defendants for purposes of telephone solicitation.

137. To the contrary, Defendants and/or their agents necessarily possessed, selected, and dialed Plaintiff's Number before Plaintiff had any interaction whatsoever with the caller during Call 1.

138. The FCC has long explained that persons who knowingly release their telephone numbers may thereby provide an invitation or permission to be called at the number they actually provided. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769, ¶ 31 (1992).

139. The FCC expressly distinguished that circumstance from one in which the caller obtains the telephone number by some other means, explaining that where a number is captured without the subscriber's knowing provision of it, the subscriber cannot thereby be considered to have invited or permitted the resulting call. *Id.*

140. The Sixth Circuit has adopted and applied that distinction. *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 342-43 (6th Cir. 2016); *see also Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 551-52 (6th Cir. 2015).

141. Plaintiff never knowingly released Plaintiff's Number to any Defendant

for Camp Lejeune calls and never authorized an intermediary to do so.

142. Nor did Plaintiff otherwise orally, electronically, or in writing invite, request, authorize, or permit any Defendant or agent to initiate the Subject Calls to Plaintiff's Number.

143. Where consent is disputed, the burden is on the caller to prove that it obtained the necessary prior express consent. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7989-90, ¶ 47 (2015).

144. Consent conveyed through an intermediary must first actually have been obtained from the called party; an intermediary cannot manufacture consent the called party never gave. *Id.* at 7990, ¶ 49.

145. Plaintiff did not "opt in" to the Subject Calls and therefore was not required to "opt out" of calls that he never authorized.

146. The FCC has expressly held that the TCPA places no affirmative obligation on a called party to opt out of calls to which the called party never consented. *Id.* at 8004, ¶ 81.

147. Defendants cannot convert Plaintiff's willingness to listen to an unlawful caller, respond to questions, or investigate the responsible parties into revocation of consent that never existed.

148. Plaintiff's use of the controlled name "Lester Clarke" was solely an investigative technique necessitated by the callers' refusal to disclose the identities of the persons and entities responsible for the telephone solicitations.

149. Plaintiff used the controlled identity as an investigative breadcrumb or fingerprint permitting him to determine where information obtained during the unsolicited call subsequently traveled.

150. Plaintiff's investigative participation did not include providing Plaintiff's Number. The caller already possessed and had dialed Plaintiff's Number before Plaintiff uttered the name Lester Clarke or supplied any other controlled information.

151. Plaintiff never told any caller to call Plaintiff again, never requested a follow-up telephone call, and never authorized future calls to Plaintiff's Number.

152. The FCC has rejected attempts to manufacture the required prior consent during the unlawful call itself. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14099, ¶ 142 (2003).

153. Conduct occurring after Call 1 had already been initiated could not retroactively transform Call 1 into a consented call.

154. Nor did Plaintiff's investigative responses create consent for subsequent Calls 2 through 18.

155. Michael acknowledged during Call 1 that Plaintiff's Number "shows on

the do not call list" and then asked Plaintiff whether he had an alternate telephone number.

156. Plaintiff declined to provide an alternate telephone number.

157. Michael's request for another telephone number confirms that Plaintiff did not provide the number Defendants had already dialed.

158. Despite the absence of consent, actual awareness of Plaintiff's do-not-call status, and Plaintiff's refusal to provide another telephone number, the lead-generation operation continued calling Plaintiff repeatedly.

159. Plaintiff's controlled investigative conduct therefore supplies evidence identifying persons who received the fruits of an unsolicited call; it does not supply consent for the unlawful call that generated those fruits.

**Do-Not-Call Knowledge**

160. Prior to Call 1, Plaintiff had communicated during earlier Camp Lejeune solicitations that he did not wish to receive further such calls.

161. During Call 1 itself, Michael from Injury Claims Service expressly acknowledged that Plaintiff's Number "shows on the do not call list."

162. That acknowledgment demonstrates actual notice of a do-not-call status associated with Plaintiff's Number.

163. Despite that actual knowledge, Call 1 continued.

164. Seventeen additional CEC calls followed during the ensuing thirteen days.

165. Plaintiff additionally called the caller-identification numbers displayed during the Subject Calls in attempts to communicate do-not-call requests.

166. Where those calls were answered, persons associated with the calling operation repeatedly refused to accept the information and terminated Plaintiff's calls.

167. CEC later admitted that its computerized dialing system supposedly would not dial numbers marked "do not call."

168. The repeated calls notwithstanding known do-not-call status support an inference that Defendants failed to implement, maintain, communicate, or honor effective do-not-call procedures.

**Consumer Enrollments Center and Intake On Demand**

169. Upon information and belief, IOD operated, controlled, owned, utilized, and/or conducted telemarketing, intake, and lead-generation activities under the name CONSUMER ENROLLMENTS CENTER ("CEC"). CEC personnel also referred to the operation as "the Enrollment Center," and calls from the operation displayed the caller-identification name "CONSUMER ENROLL." Upon information and belief, IOD/CEC functioned as a central intake and lead-routing operation in the Camp Lejeune campaign involved here.

170. During Call 2, Tony orally identified herself as being from "the Enrollment Center," the call displayed the CNAM "CONSUMER ENROLL," and Tony transmitted an email from Consumer Enrollments Center. The simultaneous use of those three substantially identical identifiers during the same transaction supports the inference that "the Enrollment Center," "CONSUMER ENROLL," and Consumer Enrollments Center all referred to the same telemarketing and intake operation.

171. Calls 2 through 18 displayed the caller-identification name "CONSUMER ENROLL."

172. Those calls repeatedly utilized two caller-identification telephone numbers: 619-586-6076 and 866-552-6086.

173. Telephone number 619-586-6076 was displayed during Calls 2, 5, and 7 through 15.

174. Telephone number 866-552-6086 was displayed during Calls 3, 4, 6, and 16 through 18.

175. Plaintiff subsequently called both numbers in an effort to identify the calling operation and communicate do-not-call requests.

176. Plaintiff reached persons identifying the business as Consumer Enrollments Center.

177. During one such investigative call, CEC provided its address as 1033 B

Avenue, Suite 200, Coronado, California.

178. That is the same address publicly utilized by IOD.

179. IOD separately published telephone number 877-584-8167 as its business contact number.

180. Plaintiff called that independently published IOD number.

181. The person answering IOD's published telephone number identified the business as "Consumer Enrollments Center."

182. These facts provide evidence independent of caller-identification information that CEC and IOD were the same operation or were operating together in the Camp Lejeune lead-generation activity.

183. A CEC representative stated that CEC used a computerized automatic telephone dialing system.

184. The representative stated that the system dialed telephone numbers in sequential order.

185. The representative further stated that the system would not dial telephone numbers marked "do not call."

186. When Plaintiff requested CEC's written do-not-call policy, the representative stated that she did not know what such a policy was.

187. Plaintiff therefore alleges that IOD/CEC initiated, caused, and/or directly

participated in Calls 2 through 18.

**Spring, Media Merchants Group, Injury Claims Service, and Adler**

188. Upon information and belief, INJURY CLAIMS SERVICE ("ICS") was a business name, operation, division, affiliate, and/or associated lead-generation operation of Spring/MMG.

189. Spring conducted business as Media Merchants Group.

190. Injury Claims Service publicly utilized the address 120 22nd Avenue South, Suite 138, Brookings, South Dakota.

191. ICS also utilized telephone number 888-597-7946.

192. Plaintiff's investigation revealed Media Merchants Group advertising using substantially the same address and the same telephone number.

193. Media Merchants Group also published telephone number 605-318-3050.

194. Plaintiff called that number and reached Defendant Adler.

195. Adler confirmed that Plaintiff had reached Injury Claims Service.

196. Adler stated that she was an owner of Injury Claims Service.

197. Adler stated that she personally supervised the Injury Claims Service telemarketing operation.

198. Adler personally participated in, directed, supervised, and/or controlled

material aspects of the Injury Claims Service telemarketing activities alleged herein.

199. When confronted regarding Camp Lejeune solicitation calls, Adler asserted that ICS possessed written consent to make such calls.

200. Adler further stated that ICS worked with dozens of law firms throughout the United States seeking Camp Lejeune claimants.

201. Call 1 was answered by a person who expressly identified himself as "Michael with Injury Claims Services."

202. Spring/ICS participated in an upstream or associated portion of the same lead-generation process at least with respect to Call 1.

203. Plaintiff presently does not know whether Spring/ICS itself operated the equipment that first selected Plaintiff's Number, whether it obtained Plaintiff's Number from another upstream source, or whether some Doe Defendant supplied or operated that component of the campaign.

204. Plaintiff therefore plausibly alleges direct participation by Spring/ICS and Adler in the lead-generation activity underlying Call 1.

**The Russo/Dolman Downstream Lead**

205. Attempts by Russo to organize an Arizona limited liability company under the RP Law name were not completed, and a Florida limited liability company bearing that name had previously been dissolved.

206. Plaintiff presently traces Calls 1, 2, 5, and 7 specifically to the Russo Firm/RP Law/Dolman lead.

207. Call 1 resulted directly in delivery of a pre-populated representation agreement identifying the Russo Firm, RP Law, and Matthew A. Dolman, P.A., now Matthew A. Dolman, PLLC.

208. Call 2 was placed less than one hour later by the same CEC representative and expressly concerned the representation agreement just sent.

209. Call 5 was another call from the same representative seeking "Lester" concerning the Camp Lejeune claim.

210. Call 7 was initiated by CEC and expressly identified the prior intake as having been conducted with Tony "with the law firm Russo Dolman."

211. Plaintiff therefore alleges that Calls 1, 2, 5, and 7 were initiated as part of the acquisition and attempted conversion of Plaintiff's controlled Lester Clarke lead for Russo Firm, RP Law, and Dolman.

212. Discovery will establish the internal allocation of the remaining calls within the joint lead-generation scheme.

213. The absence of those internal records before discovery does not negate the common design alleged herein.

**The TorHoerman/Saddle Rock Downstream Lead**

214. Plaintiff presently traces Call 12 specifically to TorHoerman and Saddle Rock.

215. During Call 12, CEC again sought the controlled "Lester" identity.

216. CEC again performed Camp Lejeune qualification activity.

217. CEC thereafter sent Plaintiff a representation agreement populated with the same controlled identifying information.

218. Unlike the Russo/Dolman representation agreement, the Call 12 agreement identified TorHoerman and Saddle Rock.

219. Materials accompanying that agreement also contained introductory correspondence on behalf of those law firms.

220. Plaintiff therefore alleges that Call 12 was made as part of the acquisition and attempted conversion of Plaintiff's controlled lead for TorHoerman and Saddle Rock.

221. The routing of the same controlled identity to separate downstream law-firm groups demonstrates the coordinated lead-generation mechanism alleged herein.

222. Discovery will establish the full scope of the downstream relationships.

**The Controlled Information as a Lead Fingerprint**

223. Plaintiff did not use the name Lester Clarke to request telephone

solicitations. Call 1 already had been initiated before Plaintiff supplied that controlled name.

224. Plaintiff supplied the unique name solely as an investigative breadcrumb or fingerprint to determine where information collected by the unidentified caller subsequently traveled.

225. That fingerprint first appeared in a representation agreement identifying Russo Firm, RP Law, and Dolman and later appeared in a separate representation agreement identifying TorHoerman and Saddle Rock.

226. CEC personnel themselves repeatedly used the controlled Lester identity in follow-up calls.

227. The controlled information therefore provides particularized evidence tracing Plaintiff's actual lead through the lead-generation system while supplying no basis for consent because Plaintiff never supplied the telephone number Defendants had already dialed.

**The Common Lead-Generation Enterprise and Joint Scheme**

228. The Subject Calls arose from a coordinated commercial process in which Defendants and other participants performed complementary functions necessary to generate, qualify, route, and convert cold-called consumers into law-firm clients.

229. The originating participant supplied or obtained telephone numbers and

initiated outbound contact.

230. Lead-generation personnel screened consumers for Camp Lejeune eligibility.

231. Intake or verification personnel obtained additional information and processed successful leads.

232. CEC possessed the ability to access downstream representation documents and deliver those documents to qualified consumers.

233. The downstream law firms furnished the legal services being marketed and stood to receive the resulting representation agreements and economic benefits.

234. The system had little commercial value unless those functions operated together.

235. An upstream caller could not monetize a Camp Lejeune lead without a downstream purchaser or recipient.

236. Conversely, a downstream law firm could not receive mass telephone-generated prospective clients without upstream lead-generation activity.

237. The same controlled Lester Clarke lead being routed through CEC to more than one law-firm group is concrete evidence of the multi-customer lead-generation system.

238. Plaintiff presently does not know whether additional Doe Defendants

supplied lists, information, dialing services, or campaign infrastructure.

239. That information is concealed by the multi-level structure of the operation.

240. Discovery of contracts, CRM records, dialer records, lead identifiers, campaign codes, invoices, payments, recordings, and routing histories will establish the precise internal relationships.

**Injury and Alternative State-Law Theories**

241. Each Subject Call invaded Plaintiff's residential privacy and caused annoyance.

242. Each Subject Call occupied Plaintiff's telephone service.

243. Plaintiff was charged on a per-call and per-minute basis for calls to Plaintiff's Number.

244. The Subject Calls therefore caused direct monetary injury in addition to nuisance, annoyance, intrusion upon seclusion, occupation of telephone service, and consumption of Plaintiff's time.

245. Those injuries are concrete, particularized, and directly traceable to the Subject Calls.

246. Plaintiff was and is a Florida resident and domiciliary and also maintains a residence in Washtenaw County, Michigan. At the time of each Subject Call,

Plaintiff was residing at and physically present in his Washtenaw County residence.

247. Plaintiff pleads his FTSA and MHSSA claims independently and, to the extent necessary, in the alternative pursuant to Fed. R. Civ. P. 8(d).

248. To the extent any Defendant contends that territorial application of one state statute excludes the other, Plaintiff expressly pleads the alternative statutory theory without electing between remedies at the pleading stage.

## VICARIOUS AND DERIVATIVE LIABILITY / CONCERTED ACTION

### Agency, Apparent Authority, Ratification, and Individual Participation

249. A seller may be liable under the TCPA for unlawful telemarketing performed by a third party acting with actual authority, apparent authority, or where the seller ratifies the third party's conduct.

250. The FCC has declared that "[a] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 13664, 13667, ¶ 7 (2005).

251. The FCC subsequently confirmed that a seller may be vicariously liable under federal common-law principles of agency, including actual authority, apparent authority, and ratification. *In re Joint Petition Filed by DISH Network, LLC*, 28 FCC

Rcd. 6574, 6584, ¶ 28 (2013).

252. Corporate actors may be held personally liable under the TCPA where they directly participate in or personally authorize the offending conduct. *Jackson Five Star Catering, Inc. v. Beason*, No. 10-10010, 2013 WL 5966340, at *4 (E.D. Mich. Nov. 8, 2013); *Currier v. PDL Recovery Group, LLC*, No. 14-12179, 2017 WL 712887, at *10-11 (E.D. Mich. Feb. 23, 2017).

253. Michigan law likewise recognizes personal liability for corporate actors who personally participate in tortious conduct. *Joy Management Co. v. City of Detroit*, 183 Mich. App. 334, 340, 455 N.W.2d 55 (1990).

254. Plaintiff's individual-liability allegations do not depend merely upon corporate status or veil piercing.

255. Adler represented that she was an owner of Injury Claims Service, stated that she personally supervised its telemarketing operation, asserted that ICS possessed written consent to place Camp Lejeune solicitation calls, and otherwise personally participated in, directed, supervised, and/or controlled material aspects of the telemarketing activity.

256. As to Russo individually, Plaintiff alleges that he conducted business as RP Law, which was identified in the representation agreement generated through Call 1, and that he participated in, authorized, directed, controlled, adopted, ratified,

and/or knowingly accepted the benefits of the telemarketing and lead-generation activities conducted through RP Law and/or for the benefit of the Russo Firm. The precise scope of his participation is within Defendants' records and will be established through discovery.

257. Plaintiff alleges direct liability against IOD/CEC for Calls 2 through 18.

258. Plaintiff alleges direct and/or vicarious liability against Spring/ICS and applicable Doe Defendants for Call 1 and direct individual liability against Adler based upon her own participation and control.

259. Plaintiff alleges vicarious and derivative liability against Russo Firm and Dolman for calls presently traced directly to the Russo/RP Law/Dolman lead, and alleges liability against Russo, individually and d/b/a RP Law, based upon his participation in, authorization of, and/or ratification of that lead-generation activity.

260. Plaintiff alleges vicarious liability against TorHoerman and Saddle Rock for the lead presently traced directly to them.

261. The downstream law firms authorized third parties to obtain, qualify, process, and deliver prospective Camp Lejeune clients.

262. CEC possessed and transmitted representation agreements identifying the downstream law firms.

263. Those agreements were populated in real time with information acquired

through the telephone intake process.

264. CEC was empowered to solicit electronic execution of those agreements.

265. Such conduct reflects authority extending materially beyond passive receipt of a name from an unrelated advertising source.

266. Call 7 expressly characterized Tony's earlier activity as an intake "with the law firm Russo Dolman."

267. CEC described itself as operating like a "concierge or receptionist for the attorneys."

268. The downstream law firms stood to obtain the commercial benefit for which the telephone solicitation system existed.

269. Upon information and belief, the law-firm Defendants authorized, accepted, paid for, retained, or otherwise knowingly received prospective-client leads produced through the telephone lead-generation process.

270. Upon information and belief, they possessed contractual or practical ability to establish lead criteria, govern use of their names and engagement documents, require compliance, audit lead sources, reject unlawfully generated leads, and discontinue noncompliant vendors.

271. The precise terms of those relationships are maintained in nonpublic records within Defendants' possession.

272. Plaintiff pleads actual authority, apparent authority, and ratification in the alternative pursuant to Fed. R. Civ. P. 8(d).

**Concert of Action, Civil Conspiracy, and Common Design**

273. Plaintiff pleads concert of action and civil conspiracy solely as derivative theories of liability for independently actionable underlying conduct and not as separate causes of action.

274. Under Michigan law, both concert of action and civil conspiracy require independently actionable underlying tortious conduct before derivative liability may attach. *Urbain v. Beierling*, 301 Mich. App. 114, 131-32, 835 N.W.2d 455 (2013).

275. Under Michigan's traditional concert-of-action doctrine, where defendants act tortiously pursuant to a common design, each participant may be held responsible for the entire result of the concerted conduct. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 337-38, 343 N.W.2d 164 (1984).

276. Concert of action does not depend upon proof that each participant personally committed every act causing the injury. Where the requisite common design and tortious participation are established, acts undertaken in furtherance of the common design may be attributed among the participants. *Id.*

277. Civil conspiracy consists of a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or a lawful purpose by unlawful

means. *Green v. Pontiac Public Library*, 350 Mich. App. 478, 495, 32 N.W.3d 487 (2024).

278. Liability arises from the independently actionable wrongful conduct committed pursuant to and in furtherance of the common purpose. *See Hanover Fire Ins. Co. v. Furkas*, 267 Mich. 14, 20-21, 255 N.W. 381 (1934).

279. Concerted conduct and common design may be established from facts and circumstances rather than solely from an express written agreement.

280. Plaintiff does not rely upon a bare assertion that Defendants acted "in concert" or "conspired."

281. CEC possessed, populated, and transmitted a representation agreement identifying Russo Firm, RP Law, and Dolman using information obtained through the telephone intake process.

282. CEC subsequently possessed, populated, and transmitted a separate representation agreement identifying TorHoerman and Saddle Rock using the same controlled prospective-client information.

283. CEC further described its role as being "like a concierge or receptionist for the attorneys," while Call 7 characterized the earlier transaction as an intake with Tony "with the law firm Russo Dolman."

284. These facts plausibly establish that Defendants were not unrelated actors

acting fortuitously, but participants performing complementary functions in a common commercial scheme designed to generate, qualify, route, and convert Camp Lejeune telephone leads into law-firm clients.

285. Plaintiff alleges that each Defendant joined, participated in, furthered, authorized, adopted, ratified, and/or knowingly accepted the benefits of that joint scheme. Although different Defendants performed different functions within the enterprise and a particular Defendant may not personally have dialed or spoken during every Subject Call, Plaintiff alleges that each Subject Call was undertaken in furtherance of the common design and that each Defendant is responsible for the actionable acts and violations committed by the other participants within the scope and furtherance of that scheme under the principles of concert of action, civil conspiracy, agency, ratification, and other derivative-liability doctrines alleged herein.

286. The contracts, campaign instructions, CRM records, lead-routing criteria, payment records, compliance requirements, communications, and other evidence establishing the precise allocation of functions among Defendants are principally within Defendants' possession.

287. Accordingly, Plaintiff alleges that all Defendants are jointly and severally liable for each actionable act and each statutory or regulatory violation

committed in furtherance of the common scheme, without regard to which participant directly dialed a particular call or personally communicated with Plaintiff.

288. Plaintiff does not seek multiple collection of the same joint-and-several judgment from different Defendants. Nothing in this paragraph waives Plaintiff's contention that separate statutory or regulatory violations arising from the same telephone call are separately compensable.

## CAUSES OF ACTION

### COUNT I
### Violation of TCPA - 47 C.F.R. § 64.1200(a)(1)(iii)

289. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

290. Plaintiff's Number is a telephone service for which Plaintiff is charged for calls.

291. Plaintiff never provided prior express consent for the Subject Calls.

292. Plaintiff never supplied Plaintiff's Number to Defendants.

293. CEC admitted using a computerized automatic telephone dialing system that dialed telephone numbers sequentially.

294. Upon information and belief, and based upon CEC's admission that its computerized automatic dialing system dialed telephone numbers sequentially together with the calling patterns alleged herein, the equipment possessed the

capacity to use a sequential number generator to store or produce telephone numbers to be called and to dial such numbers. The precise architecture and operation of the dialing equipment are matter uniquely within Defendants' possession and control.

295. The call chronology alleged in Paragraphs 48–134 reflects eighteen Subject Calls made as part of the Camp Lejeune solicitation campaign. Call 1 included a connection sound followed by a delay before a live telemarketer appeared.

296. Numerous later Subject Calls consisted of dead air or immediate hang-ups, further corroborating the automated dialing operation identified by CEC.

297. As alleged in Paragraphs 135–248, IOD/CEC directly initiated or caused Calls 2 through 18, while Spring/ICS, Adler, and applicable Doe Defendants participated in or are otherwise responsible for Call 1 according to their respective roles.

298. The downstream law-firm and individual Defendants are liable under the agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability principles alleged in Paragraphs 249–288.

299. Accordingly, Plaintiff alleges that all eighteen Subject Calls were initiated without the prior express consent required by 47 U.S.C. § 227(b)(1)(A)(iii).

300. Each of the eighteen Subject Calls constitutes a violation alleged under this Count.

301. By reason of the joint scheme, agency, ratification, concert of action, civil conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

302. The violations were knowing and/or willful.

303. Plaintiff seeks $500 per violation, trebled to $1,500 per violation pursuant to 47 U.S.C. § 227(b)(3).

**COUNT II**
**Violation of TCPA — 47 C.F.R. § 64.1200(a)(6)**

304. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

305. Section 64.1200(a)(6) prohibits disconnecting an unanswered telemarketing call prior to at least fifteen seconds or four rings.

306. When Plaintiff alleges that he "answered" Calls 4, 8, 14, and 18, he means that he physically picked up the telephone and said "hello." No live caller answered Plaintiff's greeting or engaged Plaintiff in a conversation before those calls terminated.

307. Call 4 terminated approximately eight seconds after initiation.

308. Call 8 terminated approximately eleven seconds after initiation.

309. Call 14 terminated approximately six seconds after initiation.

310. Call 18 terminated approximately eleven seconds after initiation.

311. Plaintiff alleges that Calls 4, 8, 14, and 18 remained substantively unanswered by the calling party and were disconnected before fifteen seconds or four rings, constituting four violations alleged under this Count.

312. By reason of the joint scheme, agency, ratification, concert of action, civil conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all four violations.

313. The four violations were knowing and/or willful.

314. Plaintiff seeks $500 for each violation, trebled to $1,500 per violation pursuant to 47 U.S.C. § 227(b)(3).

**COUNT III**
**Violation of TCPA — 47 C.F.R. § 64.1200(a)(7)(i)**

315. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

316. Section 64.1200(a)(7)(i) applies whenever a live sales representative is not available to speak with the person answering a telemarketing call within two seconds after the called person's completed greeting.

317. Calls 3, 4, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18 each involved a circumstance in which a live sales representative was not available to speak with

Plaintiff within two seconds after Plaintiff's completed greeting.

318. During Call 7, approximately three seconds elapsed after Plaintiff's completed greeting before James began speaking.

319. During each of the remaining thirteen calls identified in the preceding paragraph, no live sales representative spoke before the call terminated.

320. Upon information and belief, given that 14 of the 18 calls alleged in this Complaint were abandoned calls, it is reasonable to infer that the abandonment rate of calls exceeds three percent.

321. Plaintiff therefore alleges fourteen violations of 47 C.F.R. § 64.1200(a)(7)(i).

322. By reason of the joint scheme, agency, ratification, concert of action, civil conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all fourteen violations.

323. The fourteen violations were knowing and/or willful.

324. Plaintiff seeks $500 for each violation, trebled to $1,500 per violation pursuant to 47 U.S.C. § 227(b)(3).

**COUNT IV**
**Violation of TCPA — 47 C.F.R. § 64.1200(a)(7)(i)(A)**

325. Plaintiff incorporates by reference the allegations in Paragraphs 1

through 288 as if fully set forth herein.

326. Under 47 C.F.R. § 64.1200(a)(7)(i)(A), whenever a live sales representative is unavailable to speak with the called person within two seconds after the called person's completed greeting, the telemarketer or seller must provide a prerecorded identification and opt-out message.

327. The required message must disclose that the call was for telemarketing purposes, state the name of the business, entity, or individual on whose behalf the call was placed, and provide a telephone number that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.

328. Calls 3, 4, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18 each triggered the requirements of Section 64.1200(a)(7)(i)(A).

329. None of those fourteen calls provided Plaintiff with the required prerecorded identification and opt-out message.

330. None provided the required prerecorded disclosure that the call was for telemarketing purposes.

331. None provided, by prerecorded message, the name of the business, entity, or individual on whose behalf the call was placed.

332. None provided, by the required prerecorded message, a telephone

number through which Plaintiff could make the required do-not-call request during regular business hours.

333. Plaintiff therefore alleges fourteen separate violations of 47 C.F.R. § 64.1200(a)(7)(i)(A).

334. By reason of the joint scheme, agency, ratification, concert of action, civil conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all fourteen violations.

335. The fourteen violations were knowing and/or willful.

336. Plaintiff seeks $500 for each violation, trebled to $1,500 per violation pursuant to 47 U.S.C. § 227(b)(3).

**COUNT V**
**Violation of TCPA — 47 C.F.R. § 64.1200(a)(7)(i)(B)**

337. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

338. Under 47 C.F.R. § 64.1200(a)(7)(i)(B), whenever a live sales representative is unavailable to speak with the called person within two seconds after the called person's completed greeting, the telemarketer or seller must provide an automated, interactive voice- and/or key-press-activated opt-out mechanism.

339. The required mechanism must enable the called person to make a

do-not-call request before the call terminates, provide brief explanatory instructions concerning its use, automatically record the called person's telephone number to the seller's do-not-call list when exercised, and immediately terminate the call.

340. Calls 3, 4, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, and 18 each triggered the requirements of Section 64.1200(a)(7)(i)(B).

341. None of those fourteen calls provided an automated interactive voice-activated opt-out mechanism.

342. None provided a key-press-activated opt-out mechanism.

343. None provided instructions enabling Plaintiff to exercise an automated do-not-call request before termination of the call.

344. None afforded Plaintiff a mechanism that would automatically record Plaintiff's Number to the seller's do-not-call list and immediately terminate the call.

345. Plaintiff therefore alleges fourteen separate violations of 47 C.F.R. § 64.1200(a)(7)(i)(B).

346. By reason of the joint scheme, agency, ratification, concert of action, civil conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all fourteen violations.

347. The fourteen violations were knowing and/or willful.

348. Plaintiff seeks $500 for each violation, trebled to $1,500 per violation pursuant to 47 U.S.C. § 227(b)(3).

**COUNT VI**
**Violation of TCPA — 47 C.F.R. § 64.1200(d)**

349. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

350. 47 C.F.R. § 64.1200(d) prohibits a person or entity from initiating a call for telemarketing purposes to a residential telephone subscriber unless that person or entity has instituted procedures for maintaining a list of persons who request not to receive calls made by or on behalf of that person or entity.

351. The procedures required by Section 64.1200(d) must satisfy the minimum standards prescribed in subsections (d)(1) through (d)(6).

352. As alleged in Paragraph 186, when Plaintiff thereafter requested CEC's written do-not-call policy, the representative stated that she did not know what such a policy was.

353. That response, together with the repeated Subject Calls notwithstanding Plaintiff's known do-not-call status, supports the reasonable inference that IOD/CEC had not instituted the company-specific do-not-call procedures required by Section 64.1200(d).

354. The absence of a written policy known to personnel, the inability to

produce such a policy upon demand, the apparent absence of personnel training concerning the policy, and the repeated calls to a number known to be subject to a do-not-call request further evidence a systemic failure to institute the procedures mandated by Section 64.1200(d).

355. Each of the eighteen Subject Calls was initiated as part of the same telemarketing operation while the required do-not-call procedures were not instituted and therefore constitutes a violation alleged under this Count.

356. By reason of the joint scheme and the direct, agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

357. The violations were knowing and/or willful.

358. Plaintiff seeks $500 for each of the eighteen violations and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

**COUNT VII**
**Violation of TCPA — 47 C.F.R. § 64.1200(d)(1)**

359. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

360. 47 C.F.R. § 64.1200(d)(1) requires persons or entities making calls for telemarketing purposes to have a written policy, available upon demand, for

maintaining a do-not-call list.

361. Plaintiff expressly demanded a copy of CEC's written do-not-call policy.

362. As alleged in Paragraph 186, the CEC representative responding to Plaintiff's demand stated that she did not know what such a policy was.

363. CEC did not provide Plaintiff with the written policy he demanded.

364. The representative's inability even to identify or recognize the required written do-not-call policy supports the reasonable inference that IOD/CEC did not maintain and implement the written policy required by Section 64.1200(d)(1).

365. At a minimum, Defendants failed to make the required written policy available upon Plaintiff's demand, which itself constitutes noncompliance with Section 64.1200(d)(1).

366. Plaintiff further alleges that each of the eighteen Subject Calls was initiated as part of a telemarketing operation that lacked, failed to maintain, and/or failed to implement the written do-not-call policy required by Section 64.1200(d)(1).

367. Each of the eighteen Subject Calls therefore constitutes a violation alleged under this Count.

368. By reason of the joint scheme and the direct, agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable

for all eighteen violations.

369. The violations were knowing and/or willful.

370. Plaintiff seeks $500 for each of the eighteen violations and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

## COUNT VIII
## Violation of TCPA — 47 C.F.R. § 64.1200(d)(2)

371. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

372. 47 C.F.R. § 64.1200(d)(2) requires personnel engaged in any aspect of telemarketing to be informed and trained in the existence and use of the company-specific do-not-call list.

373. The CEC representative from whom Plaintiff requested the written do-not-call policy was personnel engaged in the telemarketing operation.

374. As alleged in Paragraph 186, when Plaintiff requested CEC's written do-not-call policy, that representative stated that she did not know what such a policy was.

375. A telemarketing employee's lack of knowledge concerning the existence or nature of the federally required written do-not-call policy supports the reasonable inference that the employee had not been informed and trained in the existence and use of CEC's do-not-call policy and list as required by Section 64.1200(d)(2).

376. That inference is further supported by the repeated Subject Calls notwithstanding actual knowledge that Plaintiff's Number was subject to a do-not-call request and by CEC personnel's failure or refusal to process Plaintiff's attempts to communicate do-not-call demands.

377. Plaintiff alleges that this was not an isolated misunderstanding but evidence that personnel participating in the telemarketing campaign had not been adequately informed and trained in the existence and use of the required do-not-call procedures.

378. Each of the eighteen Subject Calls was initiated or processed as part of that inadequately trained telemarketing operation and therefore constitutes a violation alleged under this Count.

379. By reason of the joint scheme and the direct, agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

380. The violations were knowing and/or willful.

381. Plaintiff seeks $500 for each of the eighteen violations and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

**COUNT IX**
**Violation of TCPA — 47 C.F.R. § 64.1200(d)(3)**

382. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

383. Plaintiff was the subscriber to a residential telephone number.

384. Plaintiff previously communicated that he did not wish to receive Camp Lejeune telephone solicitations.

385. During Call 1, Michael expressly acknowledged that Plaintiff's Number "shows on the do not call list."

386. Seventeen additional calls followed.

387. Plaintiff additionally attempted to communicate do-not-call requests through the displayed caller-identification numbers.

388. Persons associated with the calling operation repeatedly refused to accept those requests and terminated Plaintiff's calls.

389. The eighteen Subject Calls were initiated by and/or on behalf of participants in the common lead-generation enterprise notwithstanding known do-not-call status.

390. Each of the eighteen Subject Calls constitutes a violation alleged under this Count.

391. By reason of the joint scheme and the agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth

in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

392. The violations were knowing and/or willful.

393. Plaintiff seeks $500 for each violation and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

**COUNT X**
**Violation of TCPA — 47 C.F.R. § 64.1200(d)(4)**

394. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

395. Section 64.1200(d)(4) requires telemarketing callers to provide the name of the individual caller, the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

396. The calling operation utilized generic identities including Injury Claims Service, Camp Lejeune Compensation Center, "the Enrollment Center," and Consumer Enrollments Center while concealing the persons and entities on whose behalf the solicitation scheme operated.

397. Numerous Subject Calls consisted entirely of dead air or immediate hang-ups and provided none of the required identifying information.

398. During live communications, personnel also refused Plaintiff's efforts to obtain meaningful identification.

399. Each of the eighteen Subject Calls constitutes a violation alleged under this Count.

400. By reason of the joint scheme and the agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

401. The violations were knowing and/or willful.

402. Plaintiff seeks $500 for each violation and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

**COUNT XI**
**Violation of TCPA — 47 C.F.R. § 64.1601(e)**

403. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

404. Section 64.1601(e) requires telemarketers to transmit caller-identification information including calling party number ("CPN") or automatic number identification ("ANI") and, when available, the name of the telemarketer.

405. Where the telephone number of the seller, service provider, or customer-service representative is substituted, the displayed number must permit an individual to make a do-not-call request during regular business hours.

406. Plaintiff repeatedly attempted to use the displayed caller-identification

telephone numbers to identify the callers and communicate do-not-call requests.

407. Call 1 displayed 321-221-5525.

408. Plaintiff's immediate callback to that number produced a reorder signal.

409. Calls 2 through 18 displayed telephone numbers connected with CEC.

410. When Plaintiff reached CEC through those displayed numbers and attempted to communicate do-not-call demands, personnel repeatedly refused to accept the request and terminated Plaintiff's calls.

411. Each of the eighteen Subject Calls constitutes a violation alleged under this Count.

412. By reason of the joint scheme and the agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen violations.

413. Section 64.1601(e) is enforceable through the private right of action created by 47 U.S.C. § 227(c)(5). *See Dobronski v. SelectQuote Ins. Servs.*, 773 F. Supp. 3d 373, 377–80 (E.D. Mich. 2025).

414. The violations were knowing and/or willful.

415. Plaintiff seeks $500 for each violation and discretionary trebling to $1,500 per violation pursuant to 47 U.S.C. § 227(c)(5).

## COUNT XII
## Violation of MHSSA - M.C.L. §§ 445.111b(1), 445.111c(1)(f) and (g)

416. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

417. The MHSSA regulates telephone solicitations directed to residential telephone subscribers in Michigan.

418. A residential telephone subscriber includes a person residing in Michigan who has residential telephone service.

419. At the time of each Subject Call, Plaintiff was residing at and physically present in his Washtenaw County residence and used Plaintiff's Number as residential telephone service there.

420. Plaintiff therefore was a residential telephone subscriber within the meaning of the MHSSA. *See Dobronski v. Transamerica Life Ins. Co.*, 347 Mich. App. 92, 13 N.W.3d 895 (2023).

421. The Subject Calls were voice communications over a telephone made for the purpose of encouraging Plaintiff to obtain legal services concerning a purported Camp Lejeune claim, including calls that connected to Plaintiff's voice telephone line but terminated before a live representative spoke.

422. Defendants who made, caused, authorized, adopted, ratified, or participated in those calls were telephone solicitors and/or responsible principals

within the statutory scheme.

423. Plaintiff did not expressly invite or give permission prior to any Subject Call.

424. M.C.L. § 445.111b(1) requires identification of the caller and the organization or person on whose behalf the solicitation was initiated.

425. Qualifying Subject Calls failed to provide that information.

426. Instead, generic and intermediary identities were used while the downstream beneficiaries of the legal-services solicitation were concealed.

427. When Plaintiff requested meaningful identifying and contact information, persons associated with the operation refused or terminated the calls.

428. Such failure constitutes an unfair or deceptive act or practice under M.C.L. § 445.111c(1)(f).

429. M.C.L. § 445.111c(1)(g) further prohibits solicitation of a Michigan consumer who requested not to receive calls from the organization or person on whose behalf the solicitation is made.

430. Plaintiff had made such requests, and Call 1 expressly acknowledged that his Number was already on the do-not-call list.

431. The eighteen calls nevertheless occurred.

432. By reason of the joint scheme and the direct, agency, ratification,

concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen actionable MHSSA violations.

433. Plaintiff suffered actual monetary loss through per-call and per-minute charges.

434. Plaintiff seeks the remedies authorized by M.C.L. § 445.111c(3), including $250 for each of the eighteen actionable calls or actual damages, whichever is greater.

**COUNT XIII**
**Violation of the FTSA — Fla. Stat. § 501.059**

435. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 288 as if fully set forth herein.

436. At all relevant times, Plaintiff was a Florida resident and subscriber to Plaintiff's Number.

437. Plaintiff's Number bears Florida area code 321.

438. Defendants deliberately caused the Subject Calls to be made to Plaintiff's Florida 321 telephone number.

439. Fla. Stat. § 501.059 creates a rebuttable presumption concerning telephonic sales calls made to Florida area codes.

440. Plaintiff actually was a Florida resident during the relevant period.

441. Plaintiff's physical presence at his Michigan residence when he answered the Subject Calls did not extinguish his Florida residency.

442. Call 1 presents an additional Florida nexus because it displayed originating caller-identification number 321-221-5525 and caller-identification name “WINTER GDN FL.”

443. Upon information and belief, Call 1 originated from Florida and/or formed part of telephonic sales activity conducted from Florida.

444. Call 1 generated a representation agreement identifying Florida lawyers and law firms seeking to provide the legal services marketed.

445. The object of the Subject Calls was to obtain information from Plaintiff, qualify him as a prospective Camp Lejeune client, and induce execution of a legal-services representation agreement.

446. A Camp Lejeune cause of action or claim constitutes intangible personal property, and the legal representation solicited during the Subject Calls consituted services related to that intangible personal property.

447. Plaintiff never requested the initial solicitation.

448. Plaintiff never provided prior express written consent.

449. Plaintiff never supplied Plaintiff's Number to Defendants.

450. Information supplied after an unsolicited telephone call commenced

could not constitute prior express written consent to initiate that call.

451. Defendants and/or their agents failed during qualifying calls to identify themselves and the businesses on whose behalf the solicitations were made.

452. Defendants and/or their agents continued making calls after Plaintiff had communicated that he did not wish to receive them.

453. Defendants and/or their agents made and/or knowingly allowed telephonic sales calls involving automated selection or dialing of telephone numbers without Plaintiff's prior express written consent.

454. Defendants and/or their agents failed during qualifying calls to transmit caller-identification information satisfying Fla. Stat. § 501.059.

455. By reason of the joint scheme and the direct, agency, ratification, concert-of-action, civil-conspiracy, and other derivative-liability allegations set forth in Paragraphs 135–288, Plaintiff alleges all Defendants are jointly and severally liable for all eighteen FTSA violations.

456. Plaintiff seeks $500 for each violation and trebling to $1,500 for each knowing or willful violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests entry of judgment in his favor and against all Defendants as follows:

A. JOINT AND SEVERAL LIABILITY

Plaintiff requests that all Defendants be adjudged jointly and severally liable for each statutory and regulatory violation committed in furtherance of the joint scheme alleged herein, and that judgment be entered jointly and severally for the total statutory and enhanced damages set forth below.

B. TCPA DAMAGES

Plaintiff alleges the following TCPA violations:

Count I — 18 violations

Count II — 4 violations

Count III — 14 violations

Count IV — 14 violations

Count V — 14 violations

Count VI — 18 violations

Count VII — 18 violations

Count VIII — 18 violations

Count IX — 18 violations

Count X — 18 violations

Count XI — 18 violations

A total of 172 TCPA violations at $500 per violation results in statutory

damages of $86,000.00. Because Plaintiff alleges that the violations were knowing and/or willful, Plaintiff requests trebling to $1,500 per violation, for total TCPA damages of: $258,000.00.

C. MHSSA DAMAGES

Count XII alleges 18 actionable violations at $250 per violation, resulting in statutory damages of: $4,500.00.

D. FTSA DAMAGES

Count XIII alleges 18 violations at $500 per violation, resulting in statutory damages of $9,000.00. Because Plaintiff alleges that the violations were knowing and/or willful, Plaintiff requests trebling to $1,500 per violation, for total FTSA damages of: $27,000.00.

E. TOTAL JUDGMENT DEMANDED

TCPA: $258,000.00

MHSSA: $4,500.00

FTSA: $27,000.00

TOTAL: $289,500.00

Plaintiff requests judgment in the amount of TWO HUNDRED EIGHTY NINE THOUSAND FIVE HUNDRED DOLLARS ($289,500.00) against all Defendants,

jointly and severally, based upon the joint scheme and the direct, agency, ratification, concert-of-action, civil-conspiracy, common-design, and other derivative-liability theories alleged herein.

F. ALTERNATIVE ALLOCATION OF LIABILITY

Alternatively, if the Court determines that one or more Defendants are not jointly and severally liable for the entire course of conduct, Plaintiff requests judgment against each Defendant for the full statutory and enhanced damages attributable to every call and every statutory or regulatory violation for which that Defendant is found directly, vicariously, individually, through concert of action, through civil conspiracy, by ratification, or otherwise derivatively liable.

G. ONE SATISFACTION; NO WAIVER OF SEPARATE VIOLATIONS

Plaintiff seeks only one collection and satisfaction of any damages imposed jointly and severally against multiple Defendants. Plaintiff does not, however, waive or concede any contention that distinct statutory or regulatory violations arising from the same telephone call are separately actionable and separately compensable.

H. Plaintiff's taxable costs and disbursements;

I. Prejudgment and post-judgment interest to the extent permitted by law;

J. Such injunctive relief as the Court determines authorized and appropriate; and

K. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: September 13, 2026

Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
(734) 641-2300
markdobronski@yahoo.com
Plaintiff *In Propria Persona*